Good morning, Your Honors. Alexa Colby-Melinas for the Plaintiff Appellants. May it please the Court, I'd like to reserve three minutes for rebuttal. The Supreme Court has held that the central mandate of the Equal Protection Clause is racial neutrality in government decision-making. And this is one of those rare equal protection cases, at least in this day and age, where the plaintiffs start the case with what is essentially a smoking gun. A legislative record that makes perfectly clear that the dominant or primary purpose of the Arizona legislature in enacting H.B. 2443, otherwise known as the Susan B. Anthony and Frederick Douglass Prenatal Nondiscrimination Act, was to scrutinize the reasons that black and Asian women in Arizona have abortions. And with the purpose It looks like you're asking us to judge the motivation of certain legislatures as opposed to the statute itself. Your Honor, we are alleging that it is intentional discrimination. And under Arlington Heights, certainly, one of the evidence that you can What in the statute discriminates? The purpose of the statute I didn't ask the purpose or the motivation of the legislators. What in the statute discriminates? The statute is on its face applied to women of all races. And is there any evidence or history of disparate application of the statute? There is no evidence that the people aren't enforcing the law as to some women and are as to others. So is there any instance of a law being evaluated not based on what it provides, but on the motivation of some of the people who voted in the legislature for enactment of the law? Yes, Your Honor. I believe that in Shaw v. Reno, and there's a sort of a trio of voting cases, Shaw v. Reno, Miller v. Johnson, and United States v. Hayes. Those were cases where the parties alleged that the intention of the legislators in drawing districts was to discriminate on the basis of race. Because they expected the way they drew the lines would have that effect. Exactly. But the Court held that it was absolutely irrelevant that the parties couldn't prove that anything would have, that that drawing of the district lines had any actual effect on their vote. Instead, what the Supreme Court held was the mere fact that the legislators intended to do so and therefore perpetuated the notion that because people are of a certain race, they necessarily must think and act and vote in the same way as people as other races. That was the equal protection violation. And in Shaw v. Reno, there's an exchange between the dissent, Justice Stevens' dissent, where he said they should have had to be able to show an effect on the vote. And in the majority opinion, where they explained that that was ignoring that there are other harms that could fall from the legislature's intentional actions, and that was the perpetuation of racial stereotypes. That was the harm that was identified in Shaw v. Reno. I think another example of a case where intent mattered. Hear me, I'm not saying intent doesn't matter, but I don't think, and I don't share your view of those cases, I don't think I've found an instance of the court saying, we don't care what the impact of the law is, and in this instance, there's no suggestion or evidence that the law itself discriminates or has been applied in a discriminatory manner, but we are instead going to go into the heads of the legislatures who voted in favor of the law, and not necessarily all of the legislators. But if some of the legislatures had an ill motive, that's enough for us to decide the law should be struck down. And I haven't found anything that supports the proposition that you're asserting. Well, I do think that Griffin v. the Prince Edward County School Board Supreme Court decision, where the county decided to stop providing public schools at all, it affected every student in the county entirely equally. In the same way that any man can sleep under a bridge. But in fact, the actual impact is clearly disparate. You have no argument here that the actual impact is differential at all. Not in terms of denying women access to abortion, no. I think there is certainly something that is unique about this case, Your Honor, which is that the purpose is to profile women for bad acts that they're not committing. And so in that respect, it is going to be difficult for the plaintiffs to show that they are being prevented, as the district court wanted them to show, from being able to obtain abortions because they're not doing the bad acts they have been accused of doing on the basis of race. And so that definitely does set this case apart in some way. I mean, it is an outlier. Are we better off if the statute is removed? Should people be encouraged to advocate or urge a woman to abort a fetus because it's going to be the wrong gender or the wrong ethnicity? No, Your Honor, I don't think that's what this law is preventing either. I think that if you look at a case like Catholic League, for example, Catholic League for Civil Rights versus the city of San Francisco, there all the law did was express disapproval of a decision by the San Francisco cardinal to not support placement of children for adoption with same-sex couples. And it was a non-binding resolution by the city council solely expressing disapproval and asking that the cardinal change his mind. And there, individual Catholics within San Francisco were found to have standing to challenge that law as demeaning and stigmatizing to them, even though it wasn't directed to them and didn't do anything to them. And it was recognized that the causation and redressability elements of standing would also be met there because the offense that that law caused would be lifted if the law was forced to be lifted. So here the same is true. I think the intentional discrimination against the plaintiff's members is lifted if the law is lifted. And none of this is to say that it's impossible for a legislature to ever pass a law perhaps directed at some of the issues that you just raised. However, the Equal Protection Clause makes very, very clear that to do so, you cannot do so with racially discriminatory intent. Or at least if you do so with racially discriminatory intent, the plaintiffs have made out their claim and then should be allowed to move forward in the case. I mean, the State has obviously the ability, if the case moves forward, to try to put forward a compelling State interest for the law. But the only way we can get to that, as Judge Clifton points out, is to get beyond the plain language of the statute and into the legislative history and the statements and the things that were said about why the legislature was enacting this statute. Doesn't that make this different from Catholic League and all the other cases that have been cited to support standing in this case? Well, it does make it different from Catholic League. For sure, Catholic League was explicit on its face. However, there are equal protection cases that are arguably racially neutral on their face, but yet the courts do look behind into the intent of the legislature. And I think actually there's a very recent decision in the Ninth Circuit, I think it's Pacific Properties versus the City of Newport Beach, where the court held that the mere fact, once you have intent, once you can prove intent to discriminate, the mere fact that there is neutral language and the mere fact that the defendants or the State is applying the law to similarly favored class, none of that goes to negate actual discriminatory intent. Another case ---- Where's your discriminatory intent? You've indicated that the motivation may be because of belief, almost certainly false, that certain people behave in a certain way. But the point of the statute is to treat everyone the same on the face of it, and you haven't indicated any suggestion that, in fact, there's been an unequal application of the statute. And any sign that the legislators were hoping to apply the statute only to a given class, that might be intent to discriminate, but there's no sign of that. What there's a sign of is that some people have notions that we might describe as backwards and discriminatory or having a perception that certain groups of people might do things which we disfavor. I'm not sure that's an intent to discriminate. Your Honor, I have two responses. One is that, you know, I don't think anybody would dispute that say the law said on its face only black and ---- doctors shall only complete this affidavit for black and Asian women. Even if it never prevented a black and Asian woman from obtaining an abortion because they actually weren't seeking abortions for these legitimate reasons that the legislature ascribed to them, we would understand that as a facially discriminatory law. And there is ample case law in this circuit and in the Supreme Court from personnel, administration of Massachusetts v. Feeney, Hunter v. Underwood, the Pacific Shore case I just mentioned, that just because you then, when you write the statute, decide to make it facially neutral, doesn't erase the intentionally, the discriminatory intent that exists. You don't get out from under it. What's the evidence that there was an intent to apply this statute only to one group of people? There is evidence that the primary or motivating purpose behind the statute was to affect certain groups of people. The belief that certain groups of people were prone to the behavior they were trying to outlaw. But the outlaw applied to everybody. Yes, but under the Equal Protection Clause, that discriminatory intent is what makes the law violate the Equal Protection Clause. The other thing I want to point out in respect to that is that, you know, there is certainly a way in which this law is not necessarily neutral on its face. I mean, the Section 3 of the law does discuss that, how minorities are being targeted for abortion. It says that its purpose is to prohibit race-based discrimination in abortion. And, of course, the title is, you know, includes Frederick Douglass. But there's no way to monitor the reasons, the race of a fetus without monitoring the race of the woman. Right? The race of the fetus is going to be determined by the race of the woman or by the race of her partner. So if the law on its face is about protecting minorities and about preventing race discrimination in abortion, then it is on its face a racial classification, at least with respect to the race selection abortion ban. Doesn't it classify all? It's a classification of all races. So it's not just that African-American women have to be noted in the records, but white women, too. And it would be just as illegal under this statute for a woman to come in and say, I think there are too many white babies in the world, so I want an abortion because this child isn't a minority. That would be just as illegal under this statute as what, you know, the legislators were talking about. Yes, Your Honor. And under Powers v. Ohio, racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree. Again, we're just at the stage of trying to make out the prima facie claim. Right? It could be when we get to the merits that perhaps that argument that it applies to everyone equally demonstrates they had a compelling interest in the case, and that therefore this law is justified. But in terms of... Can I interrupt you? Yes. It strikes me that there are a lot of ways that you could go about challenging this statute that are very different from this. So, for example, it seems like, for example, physicians could challenge it, saying this interferes with the physician-patient relationship. If a woman comes in and says, I've had, you know, three sons, and I want a daughter, and therefore I want an abortion, without even being asked. Now, the physician can't, apparently, would be committing a felony to either perform the abortion or help the woman obtain an abortion. I would think physicians would have a ground to challenge the statute. I would think a physician who's actually charged with a felony would be in a pretty good position to bring a motion to dismiss the indictment, because the statute is unconstitutional. Why aren't those the vehicles to use to challenge the constitutionality of this statute? Why this vehicle? I don't really understand that. Well, Your Honor, in terms of the criminal prosecution, that again presumes that women are committing the bad act, so then someone has to be prosecuted for providing the abortion when that was her intent. I think that hasn't happened. The law has been unenforced. Nobody has been prosecuted under it. So that hasn't happened. I do, it is certainly conceivable that there are privacy claims that other parties who are not these parties could challenge this law. These parties are challenging under equal protection and for the racially discriminatory impact it has on them. But it is possible that someone else could challenge the law, perhaps raising a privacy claim. And, counsel, I wanted to clarify a couple of things. So first, from this case, you're not seeking leave to amend the complaint. Is that right? Well, Your Honor, we were not given, we did not have oral argument below, and there wasn't, the motion to dismiss didn't raise the issue. It raised issues that perhaps we could have fixed by amending. However, if this Court thinks for different reasons, disagrees with the district court's decisions, but thinks that there are other reasons that perhaps we could fix to fix our complaint, then, yes, we would seek leave to amend. But I, from remembering your brief, that's not in your brief, correct? No. It was in our briefs below. But not here. Okay. Then, in terms of our resolution of this case, you are in no way raising any challenge, undue burden, Casey-type argument in this case, correct? Yes. I think that's the answer to the question that Judge Smith asked. And then, lastly, I mean, I am troubled by the Arizona law for a lot of the reasons you raised in your brief, but I also have trouble with some of the Supreme Court case law in standing. So let me just ask you a hypothetical to understand your position. If the Berkeley City Council or the Academic Senate at UC Berkeley or some state action issues a resolution saying Israel practices modern-day apartheid, it's a terrible nation, and therefore we should no longer import any goods from Israel, similar to, I think, what some countries in Europe are now doing. And I am, I'm not, but if I happen to be Jewish, I get very upset by this, and I feel very stigmatized that my homeland is being labeled so blatantly by a university or a city council. Under your theory, could I sue the city council because they've issued a law that, in fact, I feel stigmatizes me? Certainly you have standing to sue. Your Honor, I mean, I think certainly in California and under Catholic League, you definitely would. But, yes, you would have standing to sue, whether or not the resolution was ultimately unconstitutional. I mean, the case in Catholic League, it wasn't actually held to be unconstitutional, but yes. You would say I could sue the city council for issuing a resolution that I feel stigmatized me, for Article III purposes? I think the law permits that, yes, Your Honor. You're at your three minutes, so... Good morning. May it please the Court, David Weinzweig on behalf of the State. The district court reached the only conclusion it could under binding Supreme Court authority in Allen v. Wright, which is that these plaintiffs lack Article III standing to raise this equal protection claim. Now, I have three quick points I want to make, other than the most important thing, which is to field any questions or concerns. And the first is the focus of plaintiff's argument below and here, which is an extensive attention to discriminatory intent. Well, that extensive attention is simply misplaced here. While discriminatory intent must certainly be established as a prima facie element of an equal protection claim, it does not impact or cure the Article III standing defect that Judge Campbell recognized in his decision. The point being this, as the Supreme Court said in Hayes, pointing to Allen, leaving nothing to the imagination, Allen v. Wright, this is a quote, if a government actor is discriminating on the basis of race, the resulting injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct. In other words, just because a claim can be brought by someone, doesn't mean it can be brought by anyone. Number two, moving on to why aren't these plaintiffs personally affected by the stigma that attaches as a result of the legislation? Your Honor, the Supreme Court has recognized that stigma is injury, that it's real and that it's serious. But it's not Article III injury in fact, as required to gain standing and invoke the power of limiting the stigma. Federal courts of limited jurisdiction, you need more in the equal protection context. These plaintiffs are members of the groups that they allege have been belittled by the legislation. They're not outsiders, they're not someone bringing an abstract claim, they're saying, look, this legislation suggests things about us that aren't true and we're the ones that suffer from that stigma. And that theory was swiftly and handily dealt with in Allen v. Wright as reaffirmed in Hayes, which is stigma alone, offense at a particular statute is not enough unless federal courts are prepared to become local debate clubs in which alternative interest groups can descend to raise different social and political viewpoints. Doesn't the language that in order to have standing, one has to be personally denied equal treatment, that's the language from Allen v. Wright, doesn't that cut against the whole idea of representational standing that the Supreme Court has acknowledged, if you have to have personally been denied, how can any representative group bring an action on behalf of a group of people? Judge Smith, you raise a very good point, which is the, both the United States Supreme Court and this Court require in an election on behalf of a group of members, you need to identify at least one individual that has actually suffered the concrete personal harm alleged, and I think that's how the courts solve that riddle or that problem. Here, that's another defect that we didn't get to, related certainly to subject matter jurisdiction. You could search the complaint and briefs in vain and you'll see no member identified as being impacted. My second point, which I think was just covered, was the existence and significance of Allen v. Wright, which is binding and controls here. It was an equal protection case. In it, the Supreme Court said what has already been said here, which is an equal protection plaintiff must allege more than stigma alone. Now, if the Supreme Court hadn't tackled standing in the equal protection context, it might be appropriate for this Court to reach out and look at what the Court does in an establishment clause context or a freedom of speech First Amendment context. But the Supreme Court has reached the issue and it's dispositive. Number three is plaintiffs list the alleged harms inflicted upon their members on pages 12 and 13 of the complaint, which appear at excerpts of record 28 and 29. Each is a different permutation of stigma. Not one alleges the concrete, personal, discrete harms recognized in the equal protection context. Indeed, plaintiffs emphasize that their members do not want to engage in the prohibited context. Let me ask you a question. If the complaint was amended to add a couple of individuals, one of whom is African-American, another of whom is Asian-American, and those individuals were to assert in the complaint that they are women, they are of childbearing years, they may seek at some point to have an abortion if they were, that could be done by pseudonyms, would that satisfy? And that they feel stigmatized by the fact that they would have to go through this process with the physician and be asked questions as to whether they're choosing an abortion to either race select or deselect or sex select or deselect. Would that satisfy your view of the standing requirement? Judge Smith, if I understand your question, it is by adding an individual and raising the same theory that is raised currently. And my answer is no. It still fails under Allen, which requires more than stigma. Here, what you have is this, what is called the alleged harm of increased stigma. It's the harm of increased scrutiny. But that harm is, or the alleged harm of increased scrutiny is just that, alleged scrutiny without any concrete consequence, other than it offends them. That's the harm. And that's stigma. It's also illusory because the statute is race neutral and requires the same question of all female patients and all races. And even if these plaintiffs had hypothesized a concrete harm and identified at least one individual member who suffered that concrete harm as required, it would not be the imminent and certainly impeding harm of increased scrutiny. It would be the impending harm required to convey constitutional standing. Now, I also want to touch, and this will be my last point, is I want to touch on really what are the centerpieces of the plaintiff's argument, which are Reno on one hand, Shaw v. Reno, and U.S. Catholic League on the other. Shaw v. Reno is not a standing case. The word standing never appears in the decision. The word Article III never appears. The word subject matter, jurisdiction, never appears. It's black-letter law under, and I'm not great with Latin, I apologize, but sub salento, that if a decision does not expressly tackle jurisdiction, it should not be offered for a reason. It should not be offered for a jurisdictional proposition. Moving beyond that, there, well, Reno didn't say we don't need harm in order, you don't need harm in order to bring in that stigma is enough. In fact, Reno found and expressed harm. It was just a different harm than recognized in racial gerrymander cases to that date. Which had been vote dilution. Well, they were presented in that case with five white plaintiffs. So the rationale and the harm of vote dilution didn't or couldn't carry the day. So what the court said is we're going to recognize another discreet concrete harm, which is the special representational harm of gerrymandering a district, sending someone to Washington, D.C., and the person being sent has in their mind the notion they are being sent to represent a certain people. And thus, an individual living, say, let's say a white male living in that gerrymandered district isn't receiving the rights accorded to all other citizens, which are in our representational democracy very important. That was a real harm, that was a discreet harm. Most important, there is a standing case in the racial gerrymander context. It's all it talks about. It's United States v. Hayes. The author, Justice O'Connor, same justice that wrote Allen v. Wright. And what does she say? She says, of course you need harm above and beyond stigma. And she points to Allen v. Wright. The discussion and the words, if you do a word search on Westlaw for stigma or denigration, the discussion of stigma and denigration in Shaw takes place in the merits. It does not take place in what is a nonexistent discussion on standing. Moving to Catholic League. Actually, counsel, I think, at least I understand your argument in Catholic League. I wanted to offer you a hypothetical. Just so I understand your position. So let's say the state of Arizona passes a law and it has a preamble and it says, Welshman, because I'm Welsh, I feel comfortable saying this, Welshman cannot be trusted with library books. They don't return them. And so then Arizona passes the law as part, that's the preamble, the law says, if you're going to check out a book at an Arizona public library, you must explain why you were checking out the book. Under your view, me being a Welshman, I do return my library books. I feel this makes me feel pretty bad. I have to explain to my kid now why we have to have this rule which checks out books because she's Welsh. But the law applies to everybody. Everyone's got to justify it. Do I have standing to challenge that law? Well, if the question is really, and maybe this is what you're getting at, only being asked of Welshmen. No, everybody. It's asked of everybody. But in the preamble to the law it says because Welsh people don't return books. That's why we're doing this. Certainly. That is not a cognizable injury, in fact, for a Welshman. Now, if it turns out that you have some library personnel that are keen in reading legislative history and they understand the basis is actually targeted at Welshmen, and as we're moving forward, the question is only being posed to Welshmen, then you have a completely different case, certainly far better than the plaintiff has here, and likely standing. So now let's jump to this case. So if there were a different complaint, and in a different complaint plaintiffs came forward and said, I'm an African-American woman, I went into the clinic, and I was asked all these questions, and it's upon my right to reason and belief that Caucasian women who went in were not asked the same questions, then would that African-American woman in that complaint have standing? I understand that's not the complaint we have here. Right. It's certainly not. I can tell you, and I haven't really delved and tackled that issue, so I don't know how many or what the sufficient affidavit would be, whether it would be statistically there are 100 African-Americans that have sought the procedure, and it turns out 87 have been asked this question. Will another 100 white women have had the procedure? And as it turns out, only 42 have been. And if you could meet whatever statistical requirements that the law would bring to bear, that's certainly a better case than we have here today. So and then this is the last point, and I apologize. I said, well, U.S. Catholic League, establishment clause case, not an equal protection clause case. And what I want to do is if I could just point the Court to footnote number 26 in that language which is a lengthy decision in which I think the Court forcefully distinguishes Catholic League from this case. And it takes place, it's a dialogue between the majority opinion and the author of the dissent, and the majority says the dissent points to this case in a different circuit. That case is nothing like this case because, and the quote is, the plaintiff has no plans to do either. So it was, well, I won't get into it. I'll just raise it, and unless the Court has any other questions, we would ask that you affirm, and we stand on our briefs. Thank you. Thank you. I'd just like to make a few points. One, as to Allen, I think that the, both the defendants and the district court took Allen's language a bit out of context. What Allen says is there can be no doubt that this sort of non-economic injury, stigmatic injury, is one of the most serious consequences of discriminatory government conduct and is sufficient in some circumstances to support standing. The plain meaning of the term sufficient means that it can be, in some circumstances, enough without showing more. The problem in Allen, yes, and our cases make clear, however, that such injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenge discriminatory conduct. I don't believe that the district court's construction of the term equal treatment as being limited to denial of benefits or inability to exercise a right is a correct interpretation of what that meant. And again, if you look at future cases like Shaw, right, nobody was denied. How do your plaintiffs differ from the plaintiffs in Allen? Well, they differ in two respects. They differ in terms of the injury and in terms of, again, who they are. So the injury in Allen was a belief that the government wasn't doing enough to enforce a nondiscrimination law nationwide, right, it was the law that would deprive racially discriminatory schools of tax-exempt status. And the plaintiffs believed that the IRS was not enforcing it well enough. It was depriving some schools, but not all schools. And that mere fact, according to the plaintiffs, caused the denigrating injury to them. That was the sole stigma they complained of, was the generalized grievance that they have that they believed the government was not following the law. That is entirely different than the situation we're faced with here, where we have the women of a state with the legislature, which has an incredibly explicit legislative history describing its motivation and purpose to pass the law to target them. I think that is an entirely different situation. The other situation, the difference with Allen, is that the victims, the plaintiffs in that case, were over a million parents of school-aged children nationwide, and the court made the example, drew the distinction that under their theory, the parent in Hawaii suffered stigmatic injury when the IRS allowed a school in Maine to keep its tax-exempt status. And that was simply too diffuse and too attenuated. But here we are talking about the sort of direct personal relationship from the conduct and to the injury with the plaintiffs that I believe Allen was supporting and said would be one of those circumstances in which the plaintiffs would have standing. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted. That concludes this morning's calendar. We're adjourned.
judges: Clifton, Owens, Smith